Thank you. Good morning, Your Honors. May it please the Court, my name is Ronald Kopp, along with my co-counsel Jessica Lopez. I am here today representing the appellant at Cormetech, and I would like to reserve four minutes, please, for rebuttal, as I indicated to the clerk earlier. You may, please proceed. Thank you, sir. In this case, Your Honors, the district court, in granting summary judgment, failed to view the facts and draw reasonable inferences in the light most favorable to the appellant, Babcock and Wilcox, and therefore we request reversal. I'll briefly address the two issues that were addressed below and that we're addressing certainly in this course. First, the magistrate judge of the district court found that B&W, and I will refer to it as B&W, which is Babcock and Wilcox, did not file its complaint within the four-year statute of limitations called out by the Ohio revised code. Specifically, she found that B&W knew or should have known no later than manufactured by the appellee Cormetech failed to meet the 24,000-hour performance guarantee. Mr. Koop, I think you can assume we pretty much know what the two claims are. I'd like to start you out with something that isn't really addressed in the brief that just sort of triggers my curiosity. Let's assume for a second that she was wrong on the statute of limitations, and let's assume that the performance guarantee matter should proceed to a trial. I'm not saying that's what this panel will do, but we'll accept that for purposes of the question. Then we move on to the question of the indemnity. She found that there wasn't any, there wasn't sufficient proof to go to a jury that there was actually any defect here. So if we were to affirm on that, I'm trying to figure out how these two claims relate together. In other words, if there is no basis for indemnity because there was no defect or omission, then can there be a violation of the performance warranty in connection with how long this catalyst will last? I've looked at the contract, I've looked at the remedy provisions in there, and it doesn't seem to be real clear as to whether this is essentially a strict liability performance guarantee that says it has to be 600 hours no matter what and no matter who knew what and when. So how do these tie together? So Judge McKeague, it's our belief that the performance guarantee is a contractual guarantee separate and apart from any defect. So even if it was solely the power plant itself's operation of the plant that was remedied by replacing the boilers, then they were still responsible for this stuff lasting a certain period of time even though the fact that it didn't was out of their control? Is that your argument? That is not our argument. If the power plant caused early deactivation in and of itself as opposed to perhaps a secondary problem, then they might be excused from that. But that was not the situation here. I thought once they replaced the boilers, this stuff's worked fine. Once they replaced the burners, later on it worked fine. But the problem with the burners is that Cormatech being the expert, knew from the very beginning that there were issues with the burners. Not that there were problems with the burners, but that the burners put out what is called high LOI, which is an indication that there is a small amount of oxygen. So there is evidence and ample evidence that Cormatech was aware that the LOI was above or had surges above 15, sometimes as high as 50 percent going up. So they knew from the beginning that they were dealing with a reduced oxygen situation, which is going to cause, the evidence shows, and they knew, phosphorus poisoning. Phosphorus poisoning was the cause of this defect. Stop right there for just a second. I want you to assume in the question, though, that we find that there wasn't a defect. I would assume implicit in that is that there wasn't something they knew that they should have taken into account and they didn't in designing the catalyst. So I want you to assume that we affirm the magistrate judge on the indemnity question, which means no defect, no omission. If that happened, and I know you don't agree with that, but if that happened, is there still a cause of action you have under the performance warranty? Under the performance warranty and presuming that phosphorus poisoning is the problem or the primary problem and not one of the secondary issues relating to burners or whatever, then yes, they have to perform. They have to cause that catalyst to perform for 24,000 hours. That's their performance guarantee irrespective of the defect. So what's the theory under which you could hold them responsible for the performance warranty because of the phosphorus problem, but at the same time there not have been a defect or an omission? It just seems like they're related together. I do think that in order for there to be a problem in meeting the 24,000 hours, that there must be a finding. And so I agree with you in this regard that they omitted doing something. What they omitted doing was considering the effect of phosphorus poisoning, which they clearly did not consider on what would occur here. So in other words, if we found no defect, no omission, which are the two elements as I understand it of the indemnity claim, then we wouldn't need to get to the performance warranty claim. Is that as simple as saying yes or no? I think the answer to that is no, because the omission requires some thought process, which I don't think is at issue with respect to whether there was phosphorus poisoning. I don't understand, but I don't want to take up any more time on this relationship question because I'm sure we have other questions. So think about that more and if there's any better way to explain it maybe in your four minutes, that would be great. Thank you. Very good. Thank you. Was Dr. Nixa? Nixa, yes, sir. Was he your witness? He was our expert, yes. And I thought he testified there was no defect in the catalyst. What he testified to was that he could not identify within the catalyst because he, of course, had never seen the catalyst. It was destroyed by quorum attack early on. No insinuation there. It was simply gone. But he couldn't identify a specific defect. What he did identify very specifically was an omission, and the omission was the consideration of the effect of phosphorus poisoning in this high LOI, low oxygen environment. So he focused very, very heavily on that omission all the way through, and we believe, Your Honor, that the magistrate judge below ignored that evidence entirely. And what should, let's say they don't make that omission. I mean, April 2007, these things are installed, and you start getting the high ammonia slip and all this kind of thing that shows there's a problem. I mean, you're pointing to an omission by quorum attack that you're What they should have done was either design for the fact that there was going to be phosphorus poisoning because it was evident that that was going to happen, or not cause us to enter into a contract with our customer, my client's customer, KCP&L, where we all guarantee 24,000 hours because they should have known that it couldn't make 24,000 hours. They're the expert. They would know that. Babcock and Wilcox would not. Did Dr. Nixa offer an alternative design that would have dealt with this phosphorus problem? He did not offer an alternative design. What would have happened would have been if you've got that much phosphorus, you would have provided a lower guarantee. I mean, this catalyst did do all that it was supposed to do in terms of eliminating NOx at the required level of So even well after this March 2008 finding, the catalyst continued to perform to do what it was supposed to do vis-a-vis the environment, even though it was kind of messed up inside. The magistrate judge seems in this case to have understood what you're saying vis-a-vis the Nixa report, but found that all of that was undercut then by Dr. Nixa's subsequent deposition testimony. So she seems to have disregarded pretty much the report and relied upon the deposition. Explain why that's right or wrong. Well, I think because in the deposition the focus was not on the omission, but the focus was on the defect. And Dr. Nixa had to admit, because he hadn't seen the catalyst, it was gone, that he couldn't identify a defect. What he was able to identify was an omission. And I believe that he with certainty in his deposition, he certainly stated with certainty in his report. But isn't it also true that the phosphorus poisoning came about because of poor combustion, and that that problem was then remedied when they replaced the burners? That is true, but the problem was known by Cormatech. Babcock and Wilcox and KCPL gave that information to Cormatech, the expert. Now, can this case go to trial on that theory if you don't have an expert that says how they should have designed around it? Well, we believe that it can't, because whether or not it could have been designed, I'm sorry. Is that in Nixa's report? I mean, he may not have said what the defect is, but did he say there's an omission, and they should have designed around it, and that was feasible? They could have come up with a different catalyst that would have addressed the phosphorus problem? I don't believe that he needs to do that. And I think it goes to your very first question, Judge McKeague, and that is, it was up to Cormatech to understand what the phosphorus poisoning issue was, and therefore, either guarantee or not guarantee 24,000 hours or some smaller amount of time. The fact is, they had that knowledge and they made that guarantee. Thank you very much. I'll reserve the rest of my time. Mr. Copper? Oh, I'm sorry, Judge. Real quick. I'm trying to understand your theory of what the breach was, okay? Is it the condition in nature, or is it the premature failure of the catalyst? So the breach of the warranty is the failure of the catalyst to live out 24,000 hours, so it is the premature failure. So you would think that there is no breach until it actually fails short of 24,000 hours? I believe that there's no actual breach, but I certainly don't agree with the arguments made on the other side that we had no obligation to provide notice or that the statute didn't accrue when we had noticed that there would be a breach. So there comes a point in time where Babcock and Wilcox knows that the catalyst is going to fail. In fact, that was in August of 2008. It failed six or seven months later. It was not as early as April of 2007. Okay. All right. Thank you. Thank you. Police and Court. My name is Brad Barman. I'm here on behalf of Appellant Cormatech, Inc. The District Court got it right. The District Court got it absolutely right. And let's start with... What all Applees say. Well, in looking at the briefing from the other side, they talk about what the District Court ignored, what the District Court failed to take into consideration, how they failed to take inferences in their favor as a non-moving party. All you need to do is look at the record to determine that that's absolutely not true. Let's talk about the statute of limitations, because that's the one where it seems to me there's a best argument that the District Court got it wrong. The whole contract here envisioned if there was a problem, they notified you and you had a chance to remedy the problem. Right? Correct. Now, in 2007, there seemed to have been indications there were things that were a problem. Notices were sent. They were concerned at that point about whether it would serve its useful life. There doesn't seem to be any dispute about that. But... And now I'm paraphrasing. I don't rely on these actual words. It seems to me when you read this, basically you're saying, we understand. We're on it. We'll solve it. Don't worry. We'll make this work. We'll make it serve its useful life. The district judge then held, for statute of limitations purposes, the very earliest date, while at the same time you're assuring them that you're going to be able to fix this stuff. It seems to me the statute of limitations would start to run when it got to the point where you agree you couldn't fix it. It wasn't going to last long enough. So tell me where, if I was to follow that analysis, where that's going wrong. Sure, Your Honor. Under the revised code in the relevant case law in Ohio for this type of claim, the statute starts to run when they knew or should have known of the breach. There's no question that when their own, B&W's own, purchase agent sends a letter to Quorum of Tech in August, August 21st of 2007, saying we have reason to believe that your catalyst will not meet the end of its performance guarantee. For them to turn around later and say we did not have notice at that point, knew or should have known. So the effect of this, I just want to make sure I understand the effect of this. The effect of this is even though you have a contractual right to remedy any problems, they should have sued you the moment that they determined there might be a problem here, i.e., 2007. Then while at the same time, then you're supposed to be working together to remedy the problem? No, Your Honor. They shouldn't have sued us right then and there, but they should have sued us within four years of that time. The district court found that the latest date for application of the statute of limitations was not that August 07 letter, although the district court did rely on it heavily. The district court came back and said October of 07, after some additional testing was done. Absolutely, they notified us of a problem. What problem did they notify us of? We weren't going to meet the performance guarantee, which is what the warranty was based on. What did you respond? What did you tell them? We are going to come in and we're going to try and figure out what the problem was. It doesn't change the fact. They should have assumed that your statement was in error, that you're stringing them along, that you're not being honest to them? Absolutely not. They should have disregarded what your client said? Absolutely not. We value the business relationship, as they said. Then they should have been able to accept your representation, that you would fix the problem, and why is it unreasonable for them not to sue and accept your representation to fix it? It seems like you're arguing against yourself here. You said this, but we really didn't mean it, so you should have sued us. Again, Your Honor, they had four years in which to sue. It's when the statute starts running. And when the statute starts running, that means, okay, it's time to sue. They could have sued. They could have sued. And they might have thought they had to sue to avoid some sort of latches argument, too. Absolutely. Some statutes, this is a four-year statute. There are a lot of statutes that are very short. And you'd say, well, okay, the statute starts running. I mean, what if it's a 90-day statute or a 120-day statute? Just because it's four years doesn't determine when the statute starts to run. Maybe what we're really saying is, should the statute start to run during the cure period? And is there any case that you have that says, yes, it should start to run, even though you have the contractual right to cure during that period? Well, Your Honor, the case relied on most heavily by us in our argument and in the district court in making the decision relative to the accrual statute limitations is Miles v. Coley and Collier Associates, 917 F. 2nd, 235. It was the bridge case. An engineer comes in and says, this bridge is likely to fail for various reasons. Years down the road, the bridge did fail. The court determined that when they were told it might fail was the time the statute started to run because it's new or should have known of the breach. It's the same situation here. It's absolutely analogous. Now, was there a cure period? Stop about it being absolutely analogous. I don't see anything in Miles that's analogous to this situation in the sense that U.S. Steel wasn't coming in and saying, oh, don't worry about it. The way you designed this, the way you installed the bridge is fine. You really don't have to be doing anything. Trust us. We'll come in and we'll fix it. That's what happened here. None of that happened unless I just missed it in Miles. Well, what happened here, Your Honor, is they notify us by their own belief, their testing, the IPT, ultimately the RCA that comes later, we can talk about it in a minute, that there's a problem. And the problem is, based on the testing, the catalyst is not going to reach end-of-life guarantees. We at that point say, we're going to come in and figure out why. And we're going to fix it. We're going to address it. Well, when we come in and start to address it, it later becomes apparent that the problem wasn't with the catalyst at all. It's not a problem we can fix. The only thing that ultimately fixed it was the changing of the burners down the road. And their own expert said – When did they have knowledge of that? Through the RCA in 2008. It doesn't change the fact that they – 2008. That was when the RCA was done. That's what I would think the statute ought to run. Well, Your Honor – But they filed suit within the four years of the 2008 date, didn't they? Right, but they knew that our catalyst was not going to meet the end-of-life guarantee in 2007. They relied upon the representation that you would fix it. That's all. The representation was we would come in and do the RCA with them and try and address the problem. It doesn't change the fact that they knew. When did – you said we found out the problem is one we cannot fix. Two questions. Number one, is that what Cormatech said to B&W at the time? That didn't come out until after the RCA. When was the RCA again? February of 2008 was that. I'm sorry. The RCA was in 2008. The report was in February 2009. Again, it doesn't change the fact that the relevant language for purposes of what the statute is, when they knew or should have known of a breach. You're telling them it's your problem, not ours. Our catalyst is fine. It's the stuff around it. Then doesn't that get in the way of them having some obligation to know that you're wrong? Respectfully, no, and here's why. They can't run from their own language. They can't run from the testing that they were a part of. The 2007 letter from their purchase agent says it won't meet the performance guarantee. That's what we contracted to do. Let's take this to a greater extreme. Let's say that in 2007, for blustering purposes or whatever, they said you're in breach. This isn't going to last its useful life. You're in breach. No unequivocal question here. But you came along and said, in my hypothetical, no, it isn't. We can fix it. Trust us. Don't worry about it. So you have these two diametrically opposing positions being advanced. Are they not entitled to rely upon your own representations in terms of the triggering of the statute of limitations, in my hypothetical? No, and what you're talking about is equitable tolling, which they're trying to argue in their briefs here, and they never raised below court. I don't think I mentioned equitable tolling. When you're talking about, Your Honor, somehow pushing the statute down based on representations we made or not, that's equitable tolling. I'm talking about when to start it, not push it. Well, again, the code says it accrues when it should have been discovered. Don't the sellers and expert sellers' assurances about whether, in fact, there is a defect, don't they matter in determining when the defect should have been discovered? Not when the company itself, the buyer, says it's not going to meet the warrant. You might want to, well, that seems unpersuasive. Did you have another question? Real quick, what are the damages? Are they pro rata in terms of if it, let's say, I mean, let's say there is a defect. I know you don't think that. It fails, you know, 10,000 hours in, so whatever percentage that is, 40 percent of the guaranteed life. Are the damages, would the damages in action, hypothetically, that tracks that be just 60 percent of the price paid? I think we're talking to 714 at this point. Most likely, the issue here, though, is because of, it goes back to the indemnification claim and the mediation between B&W and the power plant. The damages here are fixed, what they're trying to recover from us. Okay, well, that's specific to this case. So, I mean, it would seem odd that they would have to bring, or they could bring suit at a time when their damages are not, can't be determined, because you have to sort of play out the string with these catalysts and see how long they go, right? I disagree. Based on what they are claiming or what they've claimed here, the catalyst as a whole was defective. Right. It would have needed to be. That means they have a cause of action, but it doesn't mean the amount, it doesn't determine the amount of their damages. We just discussed the amount of their damages depends on when the thing fails, right? It does. But how are you going to bring the suit before the thing fails if you can't determine the damages yet? Which suggests to me maybe the time of the failure should be when it accrues. Well, again, that's not, well, it might make sense, but frankly, it's not how the statute 13, it's not how it's written. It's not how the legislature contemplated it. And the case law is clear. Doesn't that kind of conflate the fact there are two claims here, too? One is for the indemnity claim. The other is for this performance warranty claim for which there's a liquidated damage provision. The liquidated damage provision, as I read, I can't purport to understand this, but it seems to be setting up a formula that's used to calculate the amount of the liquidated damages that I think is calculated just along the lines of what Judge Kethledge has pointed to. It's calculated based upon how much of the catalyst, how long it lasted vis-a-vis how long it's supposed to last. Isn't that what these liquidated calculations did? Yes. So how are you going to know at the very beginning, even whether to file suit? At that point, you can say they didn't know it was going to last 2,400 hours. I get that. But the argument is they didn't know how close it was going to come. It may have lasted long enough where it really wasn't worth filing suit, for all we know. They did know, Your Honor, and they knew early. Based on their own expert in the testing, the IPT, they knew. Early meaning 2007 or early meaning 2008? The IPT was in 2007, and they knew that it had degraded 50% in 12% of its operational life. But they didn't know whether you could fix that to extend the useful life, right? Well, you wouldn't have been able to fix it by the nature of the catalyst. You would have had to figure out what the problem was and replace it. If you're already degraded 50% at 12% operational life, you're never going to extend it to the point where it's going to be 24,000 hours. You're telling us that as a matter of fact. It seems to make some logical sense. I wouldn't have any idea whether that was right or wrong. Well, that's based on the people that do this. But do they know exactly when it's going to go down? At 50%, when's it going to go down to the point that it's not going to make the 24? You don't know how many hours it's going to stay for. No, and based on what was happening here, it was because of the operations of the plant. It wasn't just the burners. They were firing coal out of spec. There's a lot of contingency going on. Of course. You voluntarily came in and put in a whole new set of converters, right? We put in new catalysts, yes. Did you charge them for that? Yes. All right, so they paid for that. Yes, they did. Then that one didn't meet the useful life either. Their own experts said no catalyst would have until the problems with the plant were remedied. So what's the suit over? The fact that nothing lasted 2400 hours or whatever the number is here, or is it really two components? The first set only lasted X, it was supposed to last Y. The second set only lasted Z, and it was supposed to last longer. Well, what the suit is over, the suit is over, there were problems with the B&W design. There were problems with the operations of the Kansas City light and power plant. B&W was simply trying to recoup some of those costs from us without any evidence that there was any problem with the catalyst. It's really that simple when you ask what this case is about. Okay, but the warranty claim doesn't really require a defect, does it? I mean, if you have a contract that I hereby contractually promise to you that this product will last 2400 hours, even if the product is not defective, if that product doesn't perform the 2400 hours, there's a breach of the contract, a breach of warranty, is there not? If the plant is being operated based on the assumptions that the catalyst was designed. Okay, well, that goes to the assumptions of the contract. But the original question here was we have the two claims, the indemnity claim which requires a product defect and the breach of warranty claim which in my view does not require a defect because it's contractual. Do you agree with that? I do. Okay. But even there under the catalyst warranty in 2.1 of the agreement, it divides it up into when the failure occurs, 0 to 8000, 8000 to 1600, or 16,000 to 21, and 21 to 24. It says what happens during those periods. And it seems to me what it says is that because it fails, let's just take the very first one, because it fails between 0 and 8000 hours, it says you've got to do this root cause failure evaluation. It doesn't say that at that point you're liable to them. It says at that point you come up with agreeable repairs and modifications, which I would assume means fix it. Correct. And if you can fix it, then that means there's not a breach, right? Correct. So if you can fix it and you are saying you're going to try to fix it, there's no dispute about that, right? We're going to try. So why would the statute of limitations start during the period of time when you said under the terms of the contract we can fix it so as to avoid the breach that would ultimately then be the basis of a cause of action? Again, very simply, because they knew in 07, based on their own letters and language, that the catalyst was unlikely to meet the guarantee. That's when the statute began to run. So why was there even this business about the parties agreeing to do a root cause failure evaluation? Why even bother to do that if all of these rights and remedies are triggered by their belief, absent a root cause failure evaluation, that you're in breach and you're liable? Because they have to meet the pleading requirements to say they have a good faith basis for this cause of action when they file it, right? Correct. But again, knowing that it's not going to meet the guarantee is one thing. Finding out the reason is something else, based on the statute, based on the case law. When they knew and had reason to believe. And the district court didn't say they should have known. The district court said they knew, based on the August 07 letter and the IPT. They knew, definitively knew it wasn't going to meet the performance guarantee. As currently being operated. Now, did they know that there was nothing you could do to fix it, as you were required to do under the contract? Nobody knew that until the RCA was completed. Then isn't that the whole case here? We have to figure out what is the significance of nobody knowing whether it could be fixed for purposes of triggering the statute of limitations until this root cause analysis is done. Isn't that the essence of the problem with the first claim? No, because the warranty claim isn't tied to a defect. The minute they knew it wasn't going to meet the guaranteed lifespan, that's when the statute started to run. That's where I think you fall off the wagon. Because, I mean, the breach is the failure. The breach happens at 10,000 hours, right? That's when they, that's when it, per their theory, I mean, that's when the breach happens. It's supposed to go for 24,000 hours. It goes for 10. The failure at 10 is the breach, right? No, Your Honor. No, that's not, for, you have a promise in a contract. This thing will run for 24, let's say it's a car engine. This thing will run for 24,000 hours. It conks out at 10. That failure at 10 is the breach if the promise is it will keep running until 24. If you didn't have notice before 10,000 hours. That just means you can anticipate the breach. But kind of what I'm starting to think is that, you know, 2725, to use the UCC numbers, when it talks about, you know, the cause of action accrues when the breach is or should have been discovered. I mean, that might be talking about not just a failure to, I mean, something that just sort of conks out in the manner we're talking about, but something that is performing in a defective manner all along. You know, let's say it's not cleaning out the knocks. And it's supposed to, I mean, the whole time it's not cleaning it out. I mean, once they figure that out, they should bring suit, right? And then, you know, you can have your suit. But here, you don't know, there isn't a breach until it conks out at 10,000. And they don't know their damages. They can't determine their damages. And maybe you can fix it. And you guys are all figuring this stuff out. And so it makes perfect sense to say the breach happens at 10. And that's when, that was the first time they could have known that there was a breach because it simply didn't exist yet. And they can determine their damages. As opposed to they can't determine their damages. And it's speculative. It's speculative as to when it's going to go. Nobody really knows. Speculative as to when, but not speculative that it would. They knew when it was settled that it wouldn't meet the guarantee standard. Let me explore that with you, then we'll let you sit down. I'm looking at 2.0. And 2.0 has the Catalyst Warranty and Performance Guarantee Remedies. So this is what we're talking about here on the first cause of action, right? Correct. So each one of these paragraphs that talks about what happens for catalyst life failure between different ranges of hours. Every one of these has language that says that you meet and then seller shall make indicated repairs or modifications to achieve the performance guarantee. And then it goes on to say what they have to do in order to achieve that during each one of these bracketed periods. So it would seem to me, just logically speaking, reading this, which is what I want you to react to, why the statute, let's assume you're right, they knew that as things were situated at that moment, it wasn't going to last 24 hours. I'll give you that. When that happens, then you're supposed to do the stuff the contract says and you shall make indicated repairs or modifications to achieve the performance guarantee. Correct. So if you know it's not going to last, then you're obligated to do whatever you can to make it achieve the guarantee. So it envisions changes can be made in order to achieve the guarantee. Why doesn't the statute of limitations start when you fail to do what that says in the contract? Because, again, the way the statute language reads, they knew that we weren't going to meet it by the 24,000 hours. They knew that after 1,200 hours. They knew that in August of 2007, within months of startup, when this thing was supposed to run for three years. They purchased a good from us that was supposed to do a certain thing. They knew months after that that good wasn't going to do that certain thing. The contract says if it doesn't do that certain thing, you guys come in and fix it, is Judge McKeek's point. Of course. We have a specific contract here that would seem to rebut the idea that simply because you know it's going to fail in the future means there's a breach. No, not with this contract because this contract says we'll come in and fix it. Well, our contract can't rebut the UCC or the Ohio revised code. Well, okay. I think we've got your position. Thank you. Thanks. Mr. Kopp. Thank you, sir. I think it's important to understand that when the new catalyst was put in in 2009, the new guarantee was for 9,000 hours. They improved the catalyst and through their, I suppose, experimentation, if you will, with what was going on out in Kansas City, they determined that they needed a shorter life. The original catalyst actually lasted 17,000 hours. By that, I don't mean that there wasn't an ammonia slip and so on, but it actually continued removing NOx, as it was supposed to, all the way through 17,000 hours, that is, February or March of 2009. So when we talk about performance guarantees, we rely upon the expertise of Cormatech to know what will happen. The fact is that they knew what was going to be in that plant, they knew what the LOI was going to be, and they took it upon themselves with us to guarantee to our customer, that is, my client's customer, KCP&L, 24,000 hours. So that type of knowledge is very necessary to understand. Judge Griffin, I would only correct one thing that you said. I believe that you said that in order for there to be an indemnity claim, there must be proof of a defect, and again, we believe that there must be proof of a defect or an omission. So I just wanted to be clear. What proof do you have in regard to that claim, the indemnity claim? So the proof on the indemnity claim, and I presume that you're asking about proof of an omission, is Cormatech's failure to consider, and it's throughout the evidence and throughout our brief in multiple respects, the impact of phosphorus poisoning. They did take into account the impact of chemical degradation in the form of, for example, calcium masking. But when they go through their analysis, they make no reference to phosphorus poisoning, which ends up being the problem. The phosphorus poisoning is what caused the problem with this catalyst. So according to our expert, it was that omission, the failure to consider phosphorus poisoning, which caused the problem here. We're aware that omission is right in the context. Right, right. There's any defect or from any act or omission of something. Correct. So we understand that. Right. Very good. Thank you. I want the Court to understand, as I believe it does, that what was going on in the background, according to the record, is that Babcock & Wilcox throughout the several-year period is dealing with its customer and the claims that are being made by KCP&L against Babcock & Wilcox. So my client is not simply sitting in its offices in Summit County, Ohio, twiddling its thumbs. It's dealing with very serious tens of millions of dollars in claims by KCP&L, and it isn't until those are resolved that it can pursue these indemnity claims. But at the same time, it's relying upon Cormatech to assist them in determining what the root cause is. And I want to be clear that the root cause analysis was not completed until February of 2009. That's within a month of when the replacement catalyst, Cormatech puts the new replacement catalyst in. So Cormatech charged B&W for the original catalyst, and to your point, Judge Ketledge, it also charged again entirely for the replacement catalyst, which was a nice commercial transaction for them. But the RCA was not in 2008. It wasn't until 2009, unless there are other questions I have. Let me just make sure that I understand one thing about this question of the cause of this failure and the omission claim. So your guy, Nixa, says that failure to take into account phosphorus poisoning was the cause of the early failure of the catalyst. Then in his deposition, he says he can't identify a defect in the catalyst. So the magistrate judge goes on to say that the problem with phosphorus poisoning was the product of poor congest combustion. So they end up eventually replacing these burners. Your theory then is that everybody knew what the burners were producing by way of this by-product gas from this power plant, and they should have designed around that when they designed the initial design of the catalyst. Should have designed around that and or have caused us to make a different or a lesser guarantee as to how long the catalyst was going to last. So your argument would be that even though your guy didn't say what the different catalyst would have looked like, that wasn't your responsibility, it was their responsibility. That's the bottom line here. That is correct, sir. Okay, I got it. Thank you very much. All right, the case will be submitted.